Filed 3/4/22  P. v. Mosby  CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>GABRIEL MOSBY,<br><br>     Defendant and Respondent. | A156282<br><br>(San Mateo County<br>Super. Ct. No. 16NF011711) |
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>LEROY DEON WILSON,<br><br>     Defendant and Appellant. | A156320<br><br>(San Mateo County<br>Super. Ct. No. 16NF011711) |

Defendants Gabriel Mosby and Leroy Deon Wilson were convicted of multiple counts of robbery and false imprisonment arising out an armed bank robbery.  In these consolidated appeals, each contends that the evidence is insufficient to show he aided and abetted the crimes and that the trial court abused its discretion in refusing to sever their trials from each other.  Mosby further challenges two evidentiary rulings, and Wilson contends the trial court abused its discretion in denying his motion to strike his prior convictions.  We shall affirm the judgments as to both defendants.

1

# FACTUAL AND PROCEDURAL BACKGROUND

The bank robbery took place at a First National Bank located at 6600 Mission Street in Daly City shortly after noon on September 15, 2016. The operative amended information charged four people with participating in it: Wilson, Mosby, and two other men, Daniel Velazquez-Cordero (Velazquez) and Deon Jefferson Taylor, Sr. The theory of the prosecution was that Velazquez and Taylor went into the bank and carried out the robbery, Velazquez acting as gunman and Taylor scooping up the money; Mosby went briefly into the bank beforehand, passed information along to Velazquez and Taylor, and kept watch outside; and Wilson drove the getaway car. Mosby and Wilson were tried jointly, separately from the other two defendants.

### *Mosby Enters the Bank Before the Robbery*

A man wearing a red beanie and a red shirt entered the bank about 25 minutes before the robbery. He was not a regular customer of the bank. He went up to a teller, asked for and received change for a $20 bill, took candy from a jar kept for customers, and left. He was in the bank for approximately 15 or 30 seconds. The teller who assisted him identified him at trial as Mosby.

### *The Robbery*

Just after 12:20 that afternoon, two men wearing masks and dark clothing went into the bank, told everyone to get down, and loudly demanded cash. One of the robbers held a gun that looked like an automatic weapon.

The other man, whose mask was red or red and white (described by one person as a Spiderman mask) and who was shorter than the gunman, jumped over the counter toward a teller and told her to open the drawer and give him the cash. The teller complied, and he told her to open the other drawer. She told him there was no key to the other drawer under the counter and it

2

contained only paperwork. Other tellers also opened their cash drawers, and he took money from one of them. He put the money into a bag he was carrying. The robbers left the bank. While they were in the bank, they did not appear to use any electronic device to communicate with someone outside.

More than $10,000 was missing from the tellers' drawers, including several bills of "bait money" with documented serial numbers. The tellers were instructed not to give bait money to customers.

A customer at the bank, R. Vargas, was standing at a counter, her purse on top of the counter, when the robbers entered. When the man with a gun told people to get down she lay face down on the floor. When the robbery was over, Vargas got up and saw that her purse was gone. It contained her phone, her passport, credit cards, her identification, cash, and checks. Later, her credit card accounts showed charges at a number of East Bay stores, and the cards themselves would be found in Wilson's hotel room.

### Surveillance Videos

Detective Brandon Scholes of the Daly City Police Department arrived at the bank shortly after the robbery. He viewed surveillance videos from cameras in the surrounding area. The bank is on the west side of Mission Street at the intersection of Vista Grande Avenue; a block to the west of Mission Street is Santa Barbara Avenue.[1] The surveillance videos were taken on Mission Street across from the bank, Vista Grande near the bank, and approximately a block away on Santa Barbara.

---

[1] The jury viewed a Google map of the area surrounding the bank, which is not included in the record on appeal. We have obtained from Google Maps a map of the area, and on our own motion we take judicial notice of it to provide context for testimony using street names. (Evid. Code, §§ 452, subd. (h), 459, subd. (a); *In re Gary F.* (2014) 226 Cal.App.4th 1076, 1078, fn. 2 [taking judicial notice of map not included in record].)

3

At trial, Detective Scholes described the surveillance videos taken around the time of the robbery. A clip from a camera across the street from the bank showed a Black man wearing a red beanie and t-shirt, later identified as Mosby, looking in the direction of the bank. When a pedestrian walked by, Mosby pulled out his phone and put it to his ear, then put the phone down when the pedestrian passed by as if, in Detective Scholes's estimation, he were trying to look like he was doing something legitimate like making a phone call. Another video clip showed Mosby pacing back and forth with his phone out, but not appearing to do anything with it, then stepping into an alcove, putting his head out by a few inches, and looking toward the bank. A clip from 12:18 to 12:19 p.m., just minutes before the robbery, showed Mosby turning from Vista Grande onto Mission Street, putting his phone to his ear, and running to the corner. Another clip from around the same time showed the two bank robbers walking up Vista Grande toward Mission and Mosby walking up Vista Grande from the intersection of Santa Barbara toward Mission Street, almost parallel to the robbers; Mosby looked in another direction, then his hand went up.

Video clips from 12:23, about the time the robbery was going on, showed Mosby walking quickly down Vista Grande toward Santa Barbara, then the robbers moving the same way 45 or 50 seconds later, then a two-door gold car that appeared to be a Cadillac driving away. Videos of apparently the same gold car from a surveillance camera on Santa Barbara appeared to show a Black man wearing something red or red and white on his head. The car was heading toward a major street that led to an entrance to northbound Highway 280.

Scholes later received a lead from another officer, Tracy Boes, who reviewed images from the videos and believed the man in the red beanie and

4

red shirt resembled Mosby.  Scholes looked at a photo of Mosby from the Department of Motor Vehicles and located the Facebook page of Mosby's wife, Rosetta, which contained pictures of Mosby wearing red clothing, including what appeared to be the same beanie.  He concluded Mosby was the man in the surveillance videos.

### *Evidence Found in Searches*

#### a. *Mosby*

Mosby was apprehended at the Gateway motel in Fairfield on September 22, 2016.  Detective Scholes recognized him from the surveillance photos and his distinctive gait.  Mosby was with his wife and a man later identified as Velazquez.  The room was registered to Velazquez.  When apprehended, Velazquez had $1,405 with him, none of it the bait money from the bank.

Officers searched Rosetta's home and found a red shirt and white Adidas shoes with black stripes that appeared to be the same as the shirt and shoes worn by the person in a surveillance video near the bank before the robbery.  The shirt was on a hanger and had no wrinkles, looking as if could have been a new shirt or a shirt that had been taken to the cleaners.

#### b. *Wilson*

On September 19, 2016, acting on a lead, officers went to an Extended Stay hotel in Pleasant Hill.  Wilson arrived in a gold Cadillac El Dorado, which held a loaded black semiautomatic firearm, a wallet with Wilson's identification card, credit cards in the names of three other people, and a digital scale with traces of suspected heroin.  Wilson had on his person $1,600 in cash, including three bills with serial numbers that matched the bait money.  The officers searched a hotel room registered to Wilson and found a plaid backpack that appeared to be the same as that used by one of the

robbers.  Inside the bag were Vargas's credit cards and identification cards. Officers also found a laptop computer, a black object that appeared to be a credit card skimming device, blank cards with magnetic strips, a digital scale, and what appeared to be lactose cut with heroin.

A woman later identified as Janeen Harrison, with whom Wilson had a romantic relationship, had used Vargas's credit card at a Buy Buy Baby store in Pleasant Hill, near the Extended Stay hotel where she and Wilson were staying.  When she was apprehended, checks in Vargas's name were found in her purse.  Harrison told police officers on September 19 that she first saw Vargas's cards and checks either on September 14, the day before the bank robbery, or September 15, the day of the robbery, and that she received them on September 17.

Scholes and other officers also searched Wilson's house, where they found Wilson's wife, his son, and Taylor.  Taylor was standing near a bedroom that had distinctive wooden blinds and a 49ers poster.  The bedroom closet contained Taylor's wallet and identification, as well as a jacket, sweatshirt, black pants, and shoes that were similar to those worn by one of the suspects in the bank surveillance videos.

### Cell Phone Evidence—Texts, Calls, Videos, and Locations

Police examined a cell phone associated with Mosby.  A text to Mosby's phone from Wilson's phone number on September 11 said, " 'Hope you be here real early so we get that $."  Another text from Wilson's phone said, " 'Lil Bra, now the best time to do the job is in the morning when they open up, but we can get $ [] between morning and noon so let's do this shit and get it out the way.  Hit me when you get a chance.  One love.' "  Text messages from a phone number associated with Velazquez on the morning of September 15,

the day of the robbery, indicated he and Mosby were making plans to meet and at 8:55 a.m. said, " 'I am here.' "

Mosby's cell phone carrier's records showed calls and text messages on September 15 until around 9:00 a.m. Specifically, between 5:15 and 9:02 a.m., there were multiple calls to and from Wilson's number. There were multiple calls with Velazquez's number between 7:27 a.m. and 8:56 a.m., then an incoming call from Velazquez at 12:20 p.m. that did not connect. There was a call between Mosby's phone and the number associated with Taylor at 8:59 a.m. There was then a gap until 12:34 p.m., during which there were no calls or texts with the exception of the incomplete call from Velazquez just a minute before the robbery.

Detective Scholes searched Wilson's cell phone. On it, he found an application called Marco Polo, which allows users to exchange video messages. There was a video between Wilson and Taylor on September 15, the day of the robbery, which also contained an image of Mosby wearing the same red beanie seen in surveillance videos and a jacket that looked like the one worn by the robber who wore a red mask. In the video, Wilson said something about Taylor "having fun in my house." Taylor was standing in what appeared to be a residence, in front of wooden blinds in a room with a 49ers poster; the blinds and poster appeared to be the same as those in the room in Wilson's house that Taylor apparently occupied.

Wilson's cell phone contained text messages from the phone number associated with Mosby that mirrored those on Mosby's phone. There were messages between Wilson and Taylor from the days starting on September 10, in which Wilson told Taylor he wanted to talk with him about " 'some serious stuff' " that would " 'make us or break us,' " Taylor said he did not want to walk into anything "wit [*sic*] my eyes closed," and Wilson assured

7

him they would not. There was also a message from Taylor at 8:51 on the morning of the robbery.

The cell phone call records of Wilson, Taylor, and Mosby showed that on the morning of the robbery, Wilson's phone initially connected to cell towers in Vallejo, Fairfield, and Pleasant Hill. Beginning at 10:00 a.m. the records for all three phones showed movement from towers in the Vallejo area to Daly City. Between 12:05 and 12:23 p.m., the three phones were using towers in Daly City. Taylor's cell phone carrier showed that he made calls using the same tower in Daly City used by Mosby and Wilson's phones around the time of the robbery and at no other time. Records from Wilson's cell phone carrier showed six calls to or from Taylor and Velazquez between 12:05 p.m. to 12:22 p.m. using the same cell tower in Daly City that was used by Mosby's phone. This was the only time Wilson's phone used a tower in Daly City. Mosby's cell phone records similarly did not show any indication of him being in Daly City at any other time between September 2, when his phone was activated, and September 22, when he was arrested. The carrier records showed the three phones returning from the Daly City area to Vallejo between 12:23 p.m. and 2:10 p.m.

### *Janeen Harrison's Testimony*

Harrison testified at trial under a grant of immunity. In September 2016, she was living at the Extended Stay hotel with Wilson, although he also spent time with his wife in Vallejo. Wilson paid for the room. Harrison was aware Wilson sold drugs, that he was having money problems, and that he owed money to someone. He drove a gold or yellow two-door car.

On September 14, 2016, Wilson told Harrison he needed to get money and he had to go to his house in Vallejo. Early the next morning, he told her that he would be back by 12:00, that he had to try to get some money, and

8

that they "would be okay" financially once he had done so. Later that day, he returned to the hotel with a large amount of cash in different denominations—more than he would usually carry—and credit cards in a woman's name. Harrison said to him, " 'I see you got a few dollars,' " and he answered, " 'Yeah, it didn't go like I thought it was going to. I didn't get what I thought I was gonna get, but we'll be all right.' " He asked her to get a bag out of his car, and in the back seat of the gold car she found an empty backpack that she recognized as one she owned, the same backpack the police later seized because it resembled that used in the robbery.

The following day, Harrison used, or tried to use, credit cards Wilson had given her to make purchases at stores. He had told her he got the cards from "one of his partners." After she was apprehended, police officers asked Harrison who Wilson might commit a crime with, and she said, " 'I don't know. They all got nicknames like Dee and Buss.' " At trial, she described Dee as a short Black man who lived at Wilson's house, and Buss as someone with a wife named Rosetta; she "assum[ed]" he was the person sitting next to Wilson at trial.

### *Trial, Verdict, and Sentencing*

Wilson, Mosby, Velazquez, and Taylor were charged in a single amended information with four counts of felony second degree robbery (Pen. Code, § 212.5, subd. (c))[2] and five counts of false imprisonment (§ 236). As to each count, it was alleged as to Mosby, Wilson, and Taylor that a principal in the offense was armed with a firearm (§ 12022, subd. (a)) and as to Velazquez that he personally used a firearm (§§ 1203.06, subd. (a)(1) & 12022.5, subd. (a), 12022.53, subd. (b)). The amended information included numerous allegations that Wilson and Mosby had suffered prior convictions of serious or

---

[2] All undesignated statutory references are to the Penal Code.

violent felonies, including strike convictions (§§ 667 & 1170.12, subd. (b)), rendering them subject to sentencing under the Three Strikes law (§§ 667, subds. (b)–(j) & 1170.12), and that they were ineligible for probation under section 1203, subdivision (e)(4), as well as additional enhancement allegations as to Taylor.

Before trial, the case was dismissed as to Velazquez with intent to refile charges against him. Due to scheduling difficulties on the part of his counsel, Taylor's trial was severed.

The jury found Mosby and Wilson guilty on all counts and found the firearm allegations true. Both defendants gave up their right to a jury trial on the prior conviction allegations. The trial court struck three allegations and found the remainder true.

The court sentenced Mosby to a term of 25 years to life for count 1, the robbery of one of the bank tellers, with a consecutive term of 25 years to life for count three, the robbery of Vargas. It imposed concurrent terms for the remainder of the counts and stayed the firearm enhancements, for a total term of 50 years to life. It sentenced Wilson to 25 years to life for count 1 and a consecutive 5 years for one prior (§ 667, subd. (a)), with the remainder of the sentences concurrent or stayed, for a total prison term of 30 years to life.

## DISCUSSION

### I. Denial of Motions to Sever—Mosby and Wilson

Before trial, all four original defendants sought to have their trials severed from each other, and the trial court denied the motions. Mosby argued that the case against him was weaker than that against the other defendants, that he would be prejudiced by the inflammatory evidence of Wilson's involvement, and that a joint trial would involve conflicting defenses. Wilson argued that he was the defendant with the weakest case

10

because he was not seen on video in the vicinity of the bank, and he contended the weaker circumstantial evidence of his guilt would be bolstered by stronger evidence that the other defendants were involved in the robbery.

The trial court denied the motions. In doing so, it stated that each defendant could have a fair trial in a joint trial, that none of the cases was significantly stronger than the other, and that none of the defendants had given statements implicating the others. Mosby and Wilson each argue on appeal that this ruling was erroneous and deprived them of due process of law.

Our Legislature has established a preference for joint trials. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 40 (*Coffman and Marlow*).) Section 1098 provides that when two or more defendants are jointly charged with a crime, " 'they must be tried jointly, unless the court order[s] separate trials.' " Joint trials are favored because they promote judicial efficiency and avoid inconsistent verdicts, and when defendants are charged with " 'common crimes involving common events and victims,' as here, the court is presented with a ' "classic case" ' for a joint trial." (*Coffman and Marlow*, at p. 40.)

Separate trials may be appropriate, however, " 'in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony.' " (*Coffman and Marlow*, *supra*, 34 Cal.4th at p. 40.) Severance may also be proper where " ' "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." ' " (*People v. Gomez* (2018) 6 Cal.5th 243, 274 (*Gomez*).) Where defenses are antagonistic, severance is necessary only where the defenses are irreconcilable and the

11

jury will infer unjustifiably that the conflict shows that both defendants are guilty. (*Id.* at p. 275.)

A trial court's denial of a motion to sever is reviewed for abuse of discretion, based on the facts that appeared at the time of the ruling. (*Coffman and Marlow*, *supra*, 34 Cal.4th at p. 41.) Even if there was an abuse of discretion, we reverse only if there is a reasonable probability the defendant would have received a more favorable result in a second trial. (*Ibid.*) Even if the ruling was proper at the time it was made, reversal is appropriate when joinder " 'actually resulted in "gross unfairness" amounting to a denial of due process.' " (*People v. Mendoza* (2000) 24 Cal.4th 130, 162.)

Mosby contends reversal is necessary because, although both he and Wilson were accused of aiding and abetting the same robbery, neither of them took money or falsely imprisoned anyone inside the bank, and the actions of which they were accused were not " 'common' "—that is, Mosby was accused of pre-robbery conduct and Wilson was accused of driving the getaway car, so there was "little evidentiary connection" between the two cases. And, he argues, Wilson's defense conflicted with his.

Wilson makes similar arguments, contending that he could not have been convicted of aiding and abetting the robbery if tried in isolation and that the joint trial confused the jury about the burden of proof as to each defendant. And, he contends, the evidence of his guilt was weaker than that of Mosby's and the jury was influenced by the joinder when it found Wilson guilty.

Defendants' arguments are unpersuasive. They were charged with playing different roles in carrying out the same crimes against the same victims in a single incident. Neither behaved in a more shocking manner than the other or was accused of a more serious crime, and there is no basis

12

to conclude either would be prejudiced by association with the other. Neither had made an incriminating confession. (See *Coffman and Marlow*, *supra*, 34 Cal.4th at p. 40.) Although each challenged the sufficiency of the circumstantial evidence of his own participation in the crime, their defenses were not antagonistic or irreconcilable. There is no reason to conclude the jury could not evaluate separately whether the evidence showed each aided and abetted the robbers—Mosby by going into the bank before the robbery and keeping watch outside, and Wilson by driving the getaway car—and make a reliable judgment as to the guilt or innocence of each. (See *Gomez*, *supra*, 6 Cal.5th at pp. 274–275.) Defendants do not dispute that much of the evidence presented at the joint trial would have been equally admissible at separate trials, nor do they show they were prejudiced by the admission of any evidence that would not have been cross-admissible. (See *People v. Bryant*, *Smith and Wheeler* (2014) 60 Cal.4th 335, 381 [severance of trial of two defendants from another not required where "much evidence about which they complain would have been relevant even at a separate trial"]; accord, *People v. Souza* (2012) 54 Cal.4th 90, 112 ["no evidence was presented at the joint trial that would not have been presented at a separate trial"].)

In these circumstances, we see neither an abuse of discretion in the trial court's ruling nor gross unfairness to either Mosby or Wilson in the joint trial.

## II. Sufficiency of the Evidence—Mosby and Wilson

Both Mosby and Wilson challenge the sufficiency of the evidence to support their convictions on a theory they aided and abetted the two people who carried out the robbery. We apply well settled legal standards to these questions. A person who aids and abets the commission of a crime or advises and encourages its commission is a principal in the crime. (§ 31.) To

13

establish guilt under this theory, "the prosecution must show that the defendant acted 'with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.' . . . Thus, [our high court has] held, an aider and abettor is a person who, 'acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.' " (*People v. Prettyman* (1996) 14 Cal.4th 248, 259, italics omitted; accord, *People v. Koenig* (2020) 58 Cal.App.5th 771, 799–800.)

Whether a person has aided and abetted a crime is normally a question of fact. (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054 (*Nguyen*).) Relevant to this determination are " 'presence at the scene of the crime, companionship, and conduct before and after the offense.' " (*Ibid.*) On appeal, we " ' " 'review the whole record in the light most favorable to the judgment to determine whether it contains substantial evidence—i.e., evidence that is credible and of solid value—from which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt.' " ' [Citation.] 'Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction.' " (*Id.* at pp. 1054–1055.) "[I]t is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*People v. Bean* (1988) 46 Cal.3d 919, 933.)

These principles are illustrated in *Nguyen*. The defendant was convicted of an attempted murder and a related charge of active participation in a gang on a theory of aiding and abetting, and he argued the evidence was insufficient to support the conviction. (*Nguyen, supra* 61 Cal.4th at p. 1053.) The evidence showed the defendant was a passenger in a car, which began following a car driven by the victim, carrying several members of a rival gang. (*Id.* at pp. 1026, 1053.) The car in which the defendant was riding passed the victim's car and defendant and the other passengers stared back at the victim's car. The car with defendant idled in a parking lot as the passengers looked out, then followed the victim's car when it passed by. Several blocks later the two cars stopped next to each other at a stoplight, and another passenger in the defendant's car shot the victim. (*Id.* at p. 1053.) A few days later, the defendant went to the home of one of the rival gang members who had been in the victim's car and asked him, " 'What's up with the cops?' " (*Id.* at pp. 1053–1054.) A gang expert testified that members of Asian gangs tended to go from place to place hunting for their rivals and a gang member who was not the shooter and was in the back seat of a car would be expected to back up the shooter if necessary and that members of the rival gangs were expected to be able to engage in gunfights. (*Id.* at p. 1054.) This evidence, our high court concluded, although not overwhelming, supported an inference that the defendant knew of the shooter's intent to kill, shared that intent, and aided him by spotting potential targets. (*Id.* at pp. 1055–1056.)

### A. Substantial Evidence of Mosby's Guilt

Applying these principles, we conclude there is substantial evidence that Mosby aided and abetted the robbers. His text messages indicated that in the days leading up to the robbery he and Wilson were making plans to go

15

to an establishment early in the day, shortly after it opened, to get money. On the day of the robbery, they made plans to meet, and at 8:55 a.m. Mosby said in a text to Velazquez, " 'I am here.' " Over the next few hours, his cell phone carrier's records showed that his phone travelled from Fairfield to Daly City, on the same course as Wilson and Taylor, and that he did not exchange calls or messages from them during that time. Neither his cell phone nor those of Wilson or Taylor showed they had been in Daly City in the weeks leading up to the robbery, and there is no indication Mosby had any legitimate business there. Nevertheless, he went into the bank and changed money, and the robbery took place shortly afterward. In the intervening time, he was seen standing in an alcove across the street, looking in the direction of the bank, apparently pretending to be on a phone call when people passed by, but his cell phone records showed no calls during that time. As the two robbers walked down the same street toward the bank, he moved in the same direction and gestured. After the robbery, a man wearing a head covering consistent with his was seen in the gold Cadillac, and his cell phone carrier's records showed he travelled back to Vallejo at the same time as Taylor and Wilson. The evidence is sufficient to allow a jury to infer he knew his companions were about to rob the bank and he aided and encouraged them by surveying the bank from the inside, keeping a watch on it, and signaling to them before they entered.

Mosby argues he was not inside the bank long enough to get useful information and there is no direct evidence he communicated his observations to the others. And he argues that there is no indication he was keeping a lookout at the bank immediately before or during the commission of the robbery. But the issue is not whether it would have been possible for him to do more to facilitate the robbery, it is whether there is sufficient

16

evidence to allow a reasonable factfinder to conclude he aided and encouraged the crimes. The evidence here meets that standard.

### B. Substantial Evidence of Wilson's Guilt

Wilson argues there is insufficient evidence that he was the driver of the gold Cadillac, that the Cadillac carried the robbers, or that he had the specific intent to aid and abet the commission of the robbery. Although the evidence of his guilt is circumstantial, we conclude it is sufficient to support the conviction.

There is evidence Wilson drove a gold Cadillac consistent with the one seen in a surveillance video after the robbery. His texts with Mosby in the days leading up to the robbery suggest they were planning to get money from an establishment that opened in the morning, and his texts with Taylor showed they were making " 'serious' " plans that would " 'make us or break us.' " Between 12:05, shortly after Mosby went briefly into the bank, and 12:22 p.m., a minute before the robbery, Wilson's phone showed six calls with Taylor or Velazquez's phones using a tower in Daly City. His cell phone carriers' records showed him travelling to Daly City before the robbery then back to Vallejo afterward at the same time as Mosby and Taylor.

Wilson told Harrison on the morning of the robbery that he would be getting some money, when he returned that day he had a large amount of cash and told her he "didn't get what [he] thought [he] was gonna get," he gave Harrison Vargas's credit cards for her use, and when apprehended he had in his possession approximately $1,600 in cash, including some of the bait money taken in the robbery. One of the robbers used a distinctive backpack that looked like one owned by Harrison, and after the robbery the backpack was in the back of the gold Cadillac. It contained cards stolen from

17

Vargas at the bank. Taylor was apparently staying at Wilson's house, and a jacket that looked like that used by one of the robbers was in his bedroom.

From this evidence, a reasonable jury could conclude Wilson participated in planning the robbery, that he knew of the robbers' intentions in advance, and that he encouraged and assisted them. Wilson's arguments otherwise fail.

## III. Evidentiary Issues—Mosby

Mosby raises two claims that the trial court allowed the jury to hear inadmissible evidence. We review evidentiary rulings for abuse of discretion, and even if there was an abuse of discretion we do not reverse unless there is a reasonable probability the defendant would have achieved a more favorable verdict had the court ruled differently. (*People v. DeHoyos* (2013) 57 Cal.4th 79, 130 (*DeHoyos*).)

### A. Testimony Mosby Acted as Lookout

Before trial, Mosby moved in limine to exclude testimony that he acted as a lookout and aided and abetted the other defendants on the ground it would be improper opinion testimony. The trial court denied the motion, concluding the term "lookout" was a common one and the evidence would not be prejudicial.

Mosby argues that Detective Scholes on several occasions offered inadmissible opinion testimony that he acted as a "lookout" during the robbery. He contends this testimony was improper because it amounted to expressing an opinion that he was guilty of robbery. (See *People v. Vang* (2011) 52 Cal.4th 1038, 1048 [opinions on guilt are inadmissible because the trier of fact is competent to weigh evidence and draw conclusions on guilt]; *People v. Torres* (1995) 33 Cal.App.4th 37, 45–48, 52 [improper for witness to express opinion on elements of crime and guilt or innocence of defendant, but

18

error was harmless]; *People v. Brown* (1981) 116 Cal.App.3d 820, 828–829 [improper opinion testimony that defendant was working as " 'runner' " in drug deal].)

The fundamental problem with Mosby's argument is that Scholes did not testify before the jury that Mosby acted as a "lookout." Our review of the record indicates the only time the jury heard that term was when Scholes testified that Robert Collins, the bank's head of security, knew Mosby was suspected as a lookout and therefore looked at the bank's video for the time before the robbery.[3] When defendants objected on grounds of hearsay, speculation, and improper opinion, the court stated the testimony was offered not for the truth of anything Collins said but to explain why Scholes obtained the video, and it ruled the testimony was admissible only for that purpose, "but not for opinions offered by or any information offered by Mr. Collins." We presume the jury considered the testimony only for this limited purpose (see *People v. Homick* (2012) 55 Cal.4th 816, 866-867) and, in any case, Scholes was not expressing his own opinion that Mosby's actions were those of a lookout.

To the extent Mosby's challenge might extend to Scholes's testimony that when Mosby held a phone to his ear briefly as a pedestrian walked by without manipulating it, he looked like he was trying to appear to be doing something legitimate, we reject the challenge. When Scholes so testified, defense counsel objected, and the court allowed the testimony but admonished the jury, "[Y]ou are the judges of what the significance [of Mosby's behavior] actually is. That may be [Scholes's] opinion. It may or

---

[3] We invited Mosby's counsel to identify at oral argument the portions of the record at which Scholes testified before the jury that Mosby acted as a lookout. Counsel pointed us only to the testimony about Collins's search of the surveillance video.

may not be your opinion of what you were watching. The video does speak for itself, but a witness can interpret as they see it. But it's your call." Defense counsel's objections were again overruled when Scholes testified that it appeared to him that Mosby pretended to make a phone call on another part of the surveillance videos.

A witness may express an opinion based on his or her perception where it is helpful to a clear understanding of the witness's testimony. (Evid. Code, § 800; *DeHoyos*, *supra*, 57 Cal.4th at p. 130.) "A lay witness generally may not give an opinion about another person's state of mind, but may testify about objective behavior and describe behavior as being consistent with a state of mind." (*DeHoyos*, at p. 130; see *People v. Chatman* (2006) 38 Cal.4th 344, 397 [witness was "competent to testify that defendant's behavior and demeanor were consistent with enjoyment" when kicking someone].) And it is not improper for an officer to testify about observations made when reviewing a surveillance tape. (*People v. Son* (2020) 56 Cal.App.5th 689, 696–698.)

Scholes's testimony that Mosby appeared be doing something legitimate like making a phone call falls within this rule. In any case, even if the testimony was improper, there is no probability it affected the verdict. The jury was able to view the surveillance videos, and the trial court expressly admonished the jurors that their opinion might differ from that of Scholes and that they, not Scholes, were the judges of the significance of Mosby's actions. There is no reason to conclude the jury could not follow this direction and form its own conclusions. Mosby has shown neither abuse of discretion nor prejudice.

### B. Evidence that Officer Recognized Mosby

Mosby also contends the trial court improperly allowed the jury to hear that another officer, Sergeant Tracy Boes, recognized him from the surveillance videos. He argues that this evidence prejudiced him by informing the jury that he was, or had been, the subject of police scrutiny and that it deprived him of his Fourteenth Amendment right to a fair trial.

Before trial, Mosby moved in limine to exclude any reference to Boes's statements, and the People moved to admit the evidence. At the hearing, the prosecutor explained that still photographs from the surveillance videos had been sent out, apparently to other law enforcement agencies. Boes, who worked for the San Francisco bank robbery investigation unit, recognized Mosby from prior investigations, and Boes's information was the first significant lead in the case. The prosecutor agreed that it would be prejudicial to inform the jury that Boes worked in the bank robbery unit and that he had investigated Mosby for several different bank robberies, but she argued that the source of the lead was relevant to demonstrate to the jury that the Daly City police officers did not "just decide to target [Mosby]" but rather acted on a lead and carried out an independent investigation. The trial court ruled that either the parties should agree to a stipulation that Boes believed he recognized Mosby or that Boes could testify "[a]s long as it's limited."

At trial, as Detective Scholes was testifying, the jury heard the following stipulation: "On September 15, 2016 following the bank robbery at First National Bank Sergeant Klier acquired still images of a suspect depicted in the Allstate video surveillance footage. The images depicted a black male adult wearing a red beanie and a red T-shirt. [¶] On September 15, 2016 Officer Tracy Boes reviewed the still images of the suspect and

21

believed the suspect looked similar to Gabriel Mosby." Scholes then went on to testify that after he received this tip, he conducted an independent investigation, looked at Mosby's photo from the Department of Motor Vehicles, searched social media and found Rosetta Mosby's Facebook page, which contained pictures of Mosby, and ultimately contacted Mosby.

Our high court has approved the admission of testimony of officers identifying defendants in surveillance videos or photographs. (*People v. Leon* (2015) 61 Cal.4th 569, 601.) The Court in *Leon* cited *People v. Mixon* (1982) 129 Cal.App.3d 118, 125, 130–131 (*Mixon*), which held proper an identification by Fresno Police Officers William Brown and Kirkus Burks, who viewed surveillance photographs shortly after a robbery took place, recognized the defendant in one of them, then found and arrested him in an area he was known to frequent, and *People v. Perry* (1976) 60 Cal.App.3d 608, 610-613, which found it proper for both the defendant's parole officer and Officer George Brown of the Sacramento Police Department, a police officer who had had numerous street contacts with the defendant, to identify him as a robber depicted in a surveillance film. (*Leon*, at p. 601.) Thus, in both *Mixon* and *Perry*, the jury knew or had information indicating that before the crime at issue, the defendant was well enough known to law enforcement officers that they recognized his image.

Mosby seeks to distinguish these cases on the ground that Boes's evidence was unnecessary for purposes of identifying him—since the jury could view the surveillance videos and judge for itself whether he was at the scene—and that it accordingly did not aid the jury. (See *Mixon*, *supra*, 129 Cal.App.3d at p. 130 [identification must *both* be based on personal knowledge *and* aid the jury in its identification of the person in the video].) We are unpersuaded that there was a prejudicial abuse of discretion or that

Mosby was deprived of a fair trial by admission of Boes's identification. The stipulation indicated only that Boes was an officer; it did not inform the jury, directly or indirectly, that Mosby had been investigated for other bank robberies. While we acknowledge that lay opinion identification by police officers may carry a risk of prejudice by suggesting a person has been the subject of police scrutiny (*Mixon*, *supra*, 129 Cal.App.3d at p. 129), the statement here was sanitized so as to minimize that risk, and it was relevant to explain the progress of the investigation. There is no basis to conclude the jury was improperly influenced by hearing the stipulation.

## IV. *Romero* Motion—Wilson

The trial court found Wilson had suffered three prior strike convictions, one for attempted robbery in 1986, one for robbery in 1989, and one for attempted robbery in 1991.

Before the sentencing hearing, Wilson made a *Romero* motion (*People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497) asking the trial court to exercise its discretion to strike his prior convictions for purposes of sentencing. He argued the convictions were remote: he was now 51 years old, and the prior convictions were from long ago, the most recent having occurred when he was 24 years old. In the interim, he had suffered only one criminal conviction, for felony possession for sale of narcotics in 2004, and his sentences had been relatively brief, ranging from one to four years. And, Wilson argued, his age and ill health militated against a prison term that would likely encompass most or all of the rest of his natural life, and his family ties provided a strong prospect of reintegration into society upon his release from custody. The trial court denied the motion, concluding "reluctantly" that Wilson fell within the spirit of the Three Strikes law. In so finding, the court noted Wilson's respectful demeanor in court and his love for

his family, but it explained that after three previous convictions of robbery or attempted robbery, Wilson took part in a "planned nonspontaneous takeover bank robbery in which a whole bunch of people were traumatized with a gun" and this case was the "most serious" of all his offenses, and it concluded, "I don't see how I can say Mr. Wilson has changed, gotten away from it, become a different person." Wilson contends this ruling was an abuse of the trial court's discretion.

Section 1385, subdivision (a) allows a trial court, "in furtherance of justice," to order an action dismissed. In *Romero*, our high court held that this provision grants a court discretion to strike an allegation or finding under the Three Strikes law that a defendant has been convicted of a serious or violent felony. (*Romero*, *supra*, 13 Cal.4th at pp. 529–530; *People v. Williams* (1998) 17 Cal.4th 148, 158 (*Williams*).) This discretion, while broad, is not unlimited. The court must consider both the constitutional rights of the defendant, including guarantees against disproportionate punishment, and the interests of society, including the interest in fair prosecution of properly charged crimes. (*Williams*, at pp. 159, 160–161.) In deciding whether to strike prior felony allegations under the Three Strikes law, "the court in question must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*Id.* at p. 161.) We review such a ruling for abuse of discretion and reverse only if it falls outside the bounds of reason under the applicable law and relevant facts (*id.* at pp. 158, 164), or, put another way, it "is so irrational or arbitrary that no reasonable

24

person could agree with it" (*People v. Carmony* (2004) 33 Cal.4th 367, 377). The party attacking the sentencing decision has the burden to show it meets this standard. (*Id.* at pp. 376–377.)

The standards for striking prior convictions under the Three Strikes law are "stringent." (*Carmony, supra,* 33 Cal.4th at p. 377.) The law establishes a sentencing norm, "circumscribes the trial court's power to depart from this norm," and requires it to justify explicitly its decision to do so, creating a "strong presumption that any sentence that conforms to these sentencing norms is both rational and proper." (*Id.* at p. 378.) The circumstances must be " 'extraordinary'" for a career criminal to fall outside the spirit of the Three Strikes law, and "even more extraordinary" for us to conclude all reasonable people must agree that the criminal falls outside that spirit. (*Ibid.*) In considering whether a defendant falls within the spirit of the law, we note that the Three Strikes law directs that "[t]he length of time between the prior serious or violent felony conviction and the current felony conviction shall not affect the imposition of sentence" (§ 667, subd. (c)(3)); accordingly, "at a minimum, . . . remoteness alone cannot take a defendant outside the spirit of the very law that expressly rejects remoteness as a basis for avoiding the law" (*People v. Strong* (2001) 87 Cal.App.4th 328, 342), although it can be a factor in mitigation (*People v. Avila* (2020) 57 Cal.App.5th 1134, 1141). Nor does middle age, considered alone, remove a defendant from the law's spirit. (*Strong,* at p. 345.)

An abuse of discretion may be found when a trial court is not aware of its discretion to dismiss or where it considers impermissible factors in declining to do so. (*Carmony, supra,* 33 Cal.4th at p. 378.) The trial court is not required to state its reasons for declining to strike prior convictions under section 1385, and the reviewing court presumes it considered all relevant

25

factors in the absence of an affirmative record to the contrary. (*People v. Brugman* (2021) 62 Cal.App.5th 608, 637 (*Brugman*).) Factors that have been found to support a decision not to strike prior felony allegations are the similarity of the present felony to the prior crimes, indicating a defendant had not learned his lesson; the failure to maintain employment and bring a substance abuse problem under control; failure to refrain from criminal activity in the time between the prior and current felonies; and failure to "add maturity to age." (*Williams*, *supra*, 17 Cal.4th at pp. 163–165; *Carmony*, at p. 378.)

On these standards, there was no abuse of discretion in declining to strike Wilson's prior felony allegations. The sole argument Wilson makes on this issue in his opening brief is that the trial court failed to consider the remoteness of his convictions, his youth and lack of experience at the time of those convictions, and his ill health at the time of sentencing, and that the record does not show the court balanced any relevant facts. But Wilson raised these issues in his *Romero* motion and we presume the trial court considered all relevant factors when declining to exercise its discretion to dismiss strike priors. (*Brugman*, *supra*, 62 Cal.App.5th at p. 637.) We have no reason to believe the trial court did not do so here. It expressly took into account Wilson's family bonds and respectful demeanor, and it acknowledged his argument that the robbery and attempted robbery convictions—one of which resulted in an injury—were remote, then concluded the current robbery was the "most serious" of his offenses as it was a planned armed robbery that affected multiple people. These facts, the court concluded, indicated Wilson had not changed since his earlier convictions in a manner that took him outside the spirit of the Three Strikes law. Moreover, the record shows that Wilson had not lived a law-abiding life since those

convictions—he was convicted in 2004 of possession for sale of narcotics and sold drugs for an income, and he apparently had no other employment history. This is not an "extraordinary" case in which no reasonable person could conclude the defendant falls within the spirit of the Three Strikes law. (*Carmony*, *supra*, 33 Cal.4th at p. 378.)

In his reply brief, Wilson for the first time makes a lengthy argument against the wisdom and fairness of the Three Strikes law. Although we need not consider points raised for the first time in a reply brief (*People v. Whitney* (2005) 129 Cal.App.4th 1287, 1298), we note that the question before us is not whether the Three Strikes law is good policy but whether the trial court could reasonably find that Wilson falls within its scope. Nor are we persuaded by Wilson's reliance in his reply brief on *People v. Bishop* (1997) 56 Cal.App.4th 1245, in which the appellate court rejected the People's argument that the trial court abused its discretion in dismissing a prior strike conviction. Like the *Bishop* court, we are affirming a decision of the trial court, which has considerable discretion. That we might also have upheld the trial court if it had reached a different decision, which is the posture analogous to *Bishop*, is of no moment. For the reasons we have discussed, the trial court's ruling fell within the bounds of reason.

## DISPOSITION

The judgments as to both Mosby and Wilson are affirmed.

TUCHER, P.J.

WE CONCUR:

PETROU, J.
RODRÍGUEZ, J.

*People v. Mosby/Wilson* (A156282/A156320)

27